2013 Ark. App. 204

**Beva LONG, Appellant,**

v.

**SUPERIOR SENIOR CARE, INC., and Union Standard Company, Appellees.**

**No. CA 12–927.**

Court of Appeals of Arkansas.

March 27, 2013.

Tolley & Brooks, P.A., Fayetteville, by: Evelyn E. Brooks, for appellant.

Worley, Wood & Parrish, P.A., by: Melissa Wood, for appellees.

DAVID M. GLOVER, Judge.

Beva Long appeals from the Commission's denial of her claim for workers' compensation benefits. She based her claim upon a back injury that she experienced in moving a client from a wheelchair to the bed while working for Superior Senior Care ("Superior"). Superior took the position that Long was an independent contractor, not an employee, and that, therefore, she was not covered by workers' compensation. The Administrative Law Judge ("ALJ") sided with Long in finding that she was an employee, not an independent contractor, but denied her claim for temporary-total disability benefits. The Commission reversed the ALJ on the employee finding, deciding instead that Long was an independent contractor and, as such, was not entitled to workers' compensation benefits. Because the Commission decided that Long was not an employee, it was unnecessary for it to address the temporary-total disability decision. Long brings this appeal, contending that substantial evidence does not support the Commission's decision that she was an independent contractor. We affirm.

At the hearing before the ALJ, Long testified that she started working for Superior Senior Care on September 2, 2011. She said that prior to beginning with Superior, she had worked as a CNA for Life Styles from 2003 to 2010.

She explained that her duties at Superior were given to her on a piece of paper before she went to see a client, that she was told she would make ten dollars an hour when she was hired, and that she did not negotiate her wage with anyone. She said that she never had been self-employed, had a business, or had business cards.

Long explained that she did not talk to the client about her duties, i.e., she did not tell the client what she would or would not

do, or if certain job duties would cost more than others. She said that for this particular client, she was supposed to do cooking, light housekeeping, laundry, and help with showers and getting in and out of bed. She testified that on September 2, 2011 (her first day of work), she was helping a patient from the wheelchair to the bed when the patient "went limp." Long stated that she grabbed the patient and felt something snap in her own middle back. She said that after she felt her back pop, she put the client in bed; told the client's husband that she did not think she could lift his wife anymore; and that he told her to call Superior, which she did. Long stated that she talked to Jan Throgmorton (the office manager), told Jan about her back, and asked Jan if she could leave. She said that Jan told her she had to stay at the client's house because Superior could not get anybody to cover her shift. She said she stayed there for two days, cooking and laundering, and that her back felt terrible. She explained that she did not go to Northwest Hospital until September 20 because she had never had back trouble before and thought it was a pulled muscle. After an MRI, X-rays, and pain medications, the doctor gave her a brace, which she said she had been wearing for six months to keep her spine straight. She said she took it off to sleep. She stated that she could not stand or sit for twenty minutes, that she had not been back to work because she could not physically do the job, and that she had not been back to a doctor because she doesn't have the money.

Long explained that the Self–Employment Agreement she signed provided that she could reject all or any portion of a client referral for any reason, yet when she attempted to do so after hurting her back, Superior told her she had to stay. She said that the agreement also provided that she was to negotiate with the client directly concerning such matters as time, place, and type of services, yet she did not talk to or negotiate with the client about her duties or her wages. She stated that the agreement provided that she was to be responsible for collecting all fees from a client, yet she was paid by check every week by Superior.

On cross-examination, Long acknowledged that she had a chance to look over the paperwork that she signed when she started working with Superior; that the paperwork described her status as self-employed; but that she was talking, laughing, and carrying on at the time. She acknowledged being able to read and write. She stated that she did not understand at first that she would have to pay taxes herself, but that once she realized taxes were not being deducted, she asked about it. She acknowledged that she was told her taxes were not deducted because she was self-employed.

Long stated that her first client through Superior was someone for whom she worked three hours and that the next client, where she stayed from Friday through Monday, was the person at whose house she injured her back; that she went to work for another person the following week for three days; and that after that, she worked for another client for three hours. She acknowledged that she could have refused the next two jobs after she hurt her back, but did not. She also conceded that several of the documents she signed upon starting her relationship with Superior explained that she was self-employed.

On redirect, Long stated that she did not realize at the time of signing all the papers that she was also applying for an employer-identification number. She said that no one explained the documents to her as she was signing them and that she

did not receive copies to take home. She explained that during the three days she worked after the injury that she did as little as she could, barely sweeping, heating up dinners, and filing; she did not do any lifting. She said that during the three-hour job following the injury, she only heated food and folded clothes.

Jan Throgmorton testified that she served as the office manager at Superior, where she had worked since July 2011; that her duties were to oversee the daily running of the office; and that the role of Superior was as a referral service. She explained that Superior took information from both clients and CNAs, and then put the two together. She said that the orientation process included videos to refresh the CNAs' specialties, such as transfers, privacy, and documentation. She indicated that there were five actual employees in the office and probably 100 independent-contractor CNAs in their pool. According to her, the office staff helps clients fill out the paperwork explaining what they want. When the CNAs call and ask if any jobs are available, Superior tells them what is available and what a job will entail. She stated that the CNAs are paid by the client through Superior; that as a referral service, Superior receives a referral fee; that an escrow account is set up for clients to pay into; and that Superior takes care of it for them. Even though a client could pay a CNA directly, she said that most clients set up an escrow account.

She said that it was up to each client to terminate a relationship with a CNA once a referral was made; that Superior could not terminate a CNA; that if a client called Superior and did not want the person back, Superior then informed the CNA; and that it could be the reverse, with the CNA not wanting to go back. She said that no compensation went from

Superior to a CNA; that each client set the time that a CNA was supposed to work; that each client set the CNA's duties; and that each client could work for other companies. She testified that Superior asked each CNA what minimum amount of money the CNA would accept because there were some jobs that paid more than others.

Throgmorton acknowledged receiving a call from Long on the day Long was injured, but that Long did not tell her she was hurt. She said that Long called to report that she had dropped the client, that she could not get the client up, and that neighbors had to help Long get the client in the bed. Throgmorton said that she asked Long if the client was okay and Long said, "yes"; that she then asked if Long was okay, and Long said, "yes"; that Long did not ask for relief from another person; and that she did not tell Long that she could not get help for her. Throgmorton said it was Superior's job to find someone if a CNA could not stay on the job. She said that Long had not called asking for any other jobs after October 4. She also testified that Long gave her no indication that she did not understand that she would be self-employed.

On cross-examination, Throgmorton said that Long called to report she had dropped the client because Long knew it would be an issue with the client's family. She said that if Long felt like she needed medical attention, it was Long's call and that Long should have contacted 911. Throgmorton said the CNAs were repeatedly told that it was their responsibility to do what needed to be done. She said that as far as she could recall, Long did not say anything about her back hurting and that she was surprised when the hospital called to ask for workers' compensation information; she told them there was no workers' compensation for self-employed people. Ac-

cording to Throgmorton, the call from the hospital was the first she knew of a back injury.

Throgmorton confirmed "that there would be twenty to thirty actual employees of Superior for about twelve hundred independent contractor caregivers statewide"; that anyone working in the office was an employee, but that if those office employees went into the homes, they were not. She said that Superior filed the EID number applications for the CNAs as a courtesy.

On redirect, she said that each CNA was in complete control of where the CNA wanted to go; that each CNA could refuse if a complete lift was needed and the CNA did not think she could do it.

On recross, Throgmorton said that each CNA could tell any client that the CNA wanted more money per hour if they were going to have to lift; that each CNA could negotiate with the client; and that such a change would affect the contract Superior had with the client, and Superior would have to renegotiate also.

In reviewing Commission decisions, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings and affirm if the decision is supported by substantial evidence. *Woodmancy v. Framco, Inc.*, 2011 Ark. App. 785, 387 S.W.3d 286. When the Commission denies a claim because of the claimant's failure to meet his burden of proof, the substantial-evidence standard of review requires that we affirm the Commission's decision if its opinion displays a substantial basis for the denial of relief. *Id.* In order to reverse the Commission's decision, we must be convinced that fair-minded persons with the same facts before them could not have arrived at the conclusion reached by the Commission. *Id.* If reasonable minds could have reached the result shown by the Commission's decision, we must affirm. *Id.* We defer to the Commission on issues involving the weight of the evidence in the light most favorable to the Commission's decision and affirm if it is supported by substantial evidence. *Id.*

As her primary issue in this appeal, Long contends that there was not substantial evidence to support the Commission's conclusion that she was an independent contractor. We disagree.

In *Woodmancy*, our court set forth the following factors that are to be considered in determining whether one is an employee or an independent contractor:

(1) the extent of control which, by the agreement, the master may exercise over the details of the work;

(2) whether or not the one employed is engaged in a distinct occupation or business;

(3) the kind of occupation, with reference to whether in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(4) the skill required in the particular occupation;

(5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(6) the length of time for which the person is employed;

(7) the method of payment, whether by the time or by the job;

(8) whether or not the work is a part of the regular business of the employer;

(9) whether or not the parties believe they are creating the relation of master and servant; and

(10) whether the principal is or is not in business.

2011 Ark. App. 785, at 3, 387 S.W.3d at 289.

The Commission determines the weight to be given the various factors in deciding whether an injured person is an employee or an independent contractor for purposes of workers' compensation coverage. *Id.* If control of the work is control not only of the result but also of the means and manner of the performance, the relationship of master and servant follows; if control of the means is lacking, and the employer does not undertake to direct the manner in which the employee shall work in discharging his duties, the relation of independent contractor exists. *Id.* The principal factor in determining whether the relationship is one of agency or independent contractor is the right of control. *Id.* However, the issue of whether an individual was functioning, at the time of an injury, as an employee or an independent contractor must depend on the particular facts of each case. *Franklin v. Arkansas Kraft, Inc.*, 5 Ark.App. 264, 635 S.W.2d 286 (1982).

In *Franklin, supra*, our court acknowledged that the question of an injured person's status had been the subject of much litigation and that the cases were not consistent. Our court went on to explain that

> our standard of review may compound the appearance of inconsistency.... A reading of the cases involving the issue of employee versus independent contractor indicates that such cases are frequently very close. In many of those cases, a decision either way would have been supported by substantial evidence, and therefore, the appellate court would have been required to affirm, regardless of the result reached by the Commission.

5 Ark.App. 264, at 267–68, 635 S.W.2d at 288.

Here, both the ALJ and the Commission applied the relevant factors but came to opposite conclusions. The Commission found fault in the ALJ's reasoning and concluded that Superior's regular business in no way resembled Long's occupation because Superior was merely a channel through which Long marketed her specialized services as a CNA. With respect to Superior's control over Long, the Commission explained that an independent contractor is one who contracts to do a job according to his or her own method and without being subject to the control of the other party, except as to the result of the work. The Commission further explained that Long signed an agreement, acknowledging her status as a self-employed, independent contractor, before she ever accepted an assignment from Superior. In doing so, Long also accepted responsibility for certain things, including her own training, certification, uniforms, and payment of her own taxes. In addition, the Commission noted that Long was free to market her services using other means; she was responsible for collecting her own fees if the client did not use the escrow account; she could re-negotiate her fee with clients; she could decline an assignment; and, in addition to the signed documents, her self-employment status was emphasized during orientation.

Long relies in part upon Arkansas Code Annotated section 11–9–108(a) (Repl.1996), which provides that "[n]o agreement by an employee to waive his or her right to compensation shall be valid, and no contract ... shall operate to relieve the employer ... from any liability created [by our workers' compensation statutes]" except as specifically provided by those statutes. Her reliance is misplaced. It is true that the terms of a contract, by themselves, cannot convert an employee into an independent contractor if the other surrounding facts do not support that

conclusion. Here, however, the Commission determined that the facts supported Superior's position that Long was acting as an independent contractor, not as an employee. In accordance with our standard of review, we cannot say that fair-minded persons using the same facts could not reach the same conclusion as the Commission. We therefore affirm the Commission's denial of benefits.

Because we are affirming the Commission's decision that Long was serving as an independent contractor at the time of her injury, we do not address her second point involving her claim for temporary-total disability benefits.

Affirmed.

PITTMAN and WOOD, JJ., agree.